JUDGE GARDEPHE        13 CV 6168

Counsel of Record:
ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-0148 (Primoff)
**Email: primoffr@sec.gov**

RECEIVED
SEP 03 2013
U.S.D.C. S.D.N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

    -against-

RONALD FELDSTEIN, MARA CAPITAL
MANAGEMENT LLC, and VITA HEALTH
OF AMERICA, LLC,

                    Defendants,

    -and-

TRADEMORE CAPITAL
MANAGEMENT, LLC,

                    Relief Defendant.

-------------------------------------------------------------------x

13 Civ. _____ ( ___ )

**COMPLAINT**

**ECF CASE**

JURY TRIAL DEMANDED

       Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Ronald Feldstein ("Feldstein"), Mara Capital Management LLC ("Mara

Capital"), and Vita Health of America, LLC ("Vita Health") (collectively "Defendants") and

Relief Defendant Trademore Capital Management, LLC ("Trademore" or "Relief Defendant"),

alleges as follows:

## SUMMARY OF ALLEGATIONS

    1.     This action involves Ronald Feldstein, an individual who carried out a two-part

fraudulent securities scheme that began in late 2008 and continued to late 2011.  In the first part

of the scheme, from December 2008 through February 2009, Feldstein and his two entities, Mara Capital and Vita Health, defrauded three different broker-dealers through an unlawful "free-riding" trading scheme that caused them more than $2 million in losses. Then, later in 2009 and continuing into 2011, Feldstein bilked several investors out of more than $450,000 through fraudulent offerings of securities.

2.     In Feldstein's free-riding scheme, he purported to be operating two investment funds, Mara Capital and Vita Health, which were in fact thinly-capitalized entities that he owned and controlled for his own personal trading. Feldstein opened accounts at three broker-dealers in Mara Capital's and Vita Health's names, and then defrauded the broker-dealers by making large stock purchase orders through them for which Defendants had neither the means nor the intention to pay with their own funds.

3.     It was critical to Feldstein's scheme that the accounts he opened with these broker-dealers were "delivery versus payment," or "DVP accounts," because such accounts did not require Defendants to maintain cash in them. The broker-dealers offered the DVP accounts to Feldstein with the understanding that he and his entities held sufficient cash with a third party custodial bank to settle trades in the DVP accounts, and that Feldstein and his entities would make that cash available to settle trades he ordered by issuing instructions to the custodial bank to send cash to the DVP accounts.

4.     Defendants falsely represented to these broker-dealers or otherwise intentionally led them to believe both that they had sufficient cash in their custodial account to settle their trades, when Defendants knew they did not, and that they would issue instructions to settle these trades, when Defendants knew they would not if the trades were substantially unprofitable.

5.     Defendants' undisclosed plan was to trade risk-free with these broker-dealers'

2

money: When they purchased securities, they intended to pay for them with proceeds from an off-setting sale they would arrange with another broker-dealer before the settlement date. Thus, they intended to settle those trades where the price of the securities they purchased rose after the trade date, use the sales proceeds to pay for them, and pocket the profit. But Defendants knew that if the price of the security declined substantially after the trade, they could not pay for them with an off-setting sale, and could not and never intended to pay for them with their own funds. Rather, their plan was simply to refuse to issue instructions to settle the trades, and stick the broker-dealers with the unprofitable positions. Defendants carried out their "Heads We Win, Tails You Lose" scheme from September 2008 through February 2009 with three different broker-dealers and millions of dollars in securities trades, causing more than $2 million in losses to the broker-dealers, while simultaneously avoiding bearing those losses themselves.

6.      Later in 2009 and continuing to 2011, Feldstein shifted his fraudulent conduct to several individual investors, whom he induced to give him and Trademore approximately $450,000, based upon his various false promises to use that money to (1) purchase stock for them in a certain penny-stock issuer; (2) invest in a purported fashion company's initial public offering ("IPO"); and (3) invest in a hedge fund that Feldstein falsely described as substantial and successful. Feldstein never intended to purchase stock for these investors with this money, invest their money in an IPO, or invest their money in a hedge fund, and he never did so. Rather, he converted that money (much of which the investors had intended for retirement or their children's education) for his own personal use, which included funding a luxurious lifestyle that involved a Bentley automobile, summers in the Hamptons, and casino junkets.

7.      By virtue of the conduct alleged in this Complaint, Defendants, singly or in concert, have engaged in transactions, acts, practices, and/or courses of business that constitute

3

violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), [15 U.S.C.A. § 78j(b)], and Rule 10b-5(b) thereunder, [17 C.F.R. § 240.10b-5(b)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 21(d)(1) of the Exchange Act, [15 U.S.C. § 78u(d)(1)], seeking a final judgment:  (a) permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged herein; (b) requiring Defendants and Relief Defendant to disgorge the ill-gotten gains they received, if any, as a result of their violations, and to pay prejudgment interest thereon; (c) barring Feldstein from participating in future penny stock offerings pursuant to pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act, [15 U.S.C. § 78u(d)(6)]; and (d) imposing civil monetary penalties upon Feldstein pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and upon all Defendants pursuant to Section 21(d)(3) of the Exchange Act, [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Venue lies in this District pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Feldstein resides in the Southern District of New York, Mara Capital's and Vita Health's principal places of business are in the Southern District of New York and certain of the

transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York.

11.     Feldstein, Mara Capital, and Vita Health made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

## DEFENDANTS

12.     **Ronald Feldstein**, age 67, is a resident of New York, New York.

13.     **Mara Capital** is a New York corporation with its principal place of business in New York, New York at Feldstein's residence.  Mara Capital purports to be an investment fund. Feldstein is the owner of Mara Capital, which was incorporated on or around September 10, 2008.

14.     **Vita Health** is a New York corporation with its principal place of business in New York, New York at Feldstein's residence.  Vita Health purports to be an investment fund. Feldstein is the owner of Vita Health, which was incorporated on or around June 2, 2005.

## RELIEF DEFENDANT

15.     **Trademore** is a New York corporation with its principal place of business in New York, New York at Feldstein's residence.  Trademore purports to be an investment fund. Feldstein is the owner of Trademore, which was incorporated on or around March 23, 2009.

## OTHER RELEVENT ENTITY

16.    **MJJS Corp. LLC** ("MJJS") was a New York corporation headquartered in Syosset, New York that has never been registered with the Commission in any capacity. MJJS was dissolved on or around April 27, 2011.

## FACTS

17.    From September 2008 through April 2009, Feldstein, Vita Health, and Mara Capital engaged in a fraudulent free-riding scheme, trading through DVP accounts at several broker-dealers, identified herein as "Broker-Dealer A" "Broker-Dealer B", and "Broker-Dealer C".

18.    A DVP account does not hold customer funds or securities and is instead used for trading. The brokerage firm where a DVP account is held is known as the "executing" broker. By definition, such accounts allow a customer to buy securities at the executing broker and not pay for them until delivery and settlement, usually arranged with a different custodial account held by the customer at another firm, which the customer identifies to the executing broker upon opening the DVP account. Settlement is the process by which securities are delivered in exchange for cash payment to complete a trade. The settlement date for the purchase or sale of stock is usually three business days after a trade is made.

19.    Defendants set up DVP accounts with Broker-Dealer A, Broker-Dealer B, and Broker-Dealer C to engage in a fraudulent "free-riding" scheme, in which they would purchase securities risk-free, gambling only with the broker-dealers' money. They did so by leading the executing brokers to believe that they had sufficient cash to pay for their purchases and intended to make such cash available by instructing the custodial bank to settle the trades.

20.    Feldstein conducted his trading for Mara Capital in DVP accounts through an

account Mara Capital held with a London-based institution ("London Broker"). London Broker performed settlement services for Feldstein and Mara Capital in connection with Feldstein's trading activity at numerous executing broker-dealers. London Broker had an agreement for access to an omnibus account with a Netherlands-based bank (the "Intermediary Bank"), which in turn had an agreement with its United States agent bank (the "Clearing Bank"), to settle securities trades and custody securities on behalf of Intermediary Bank's customers with access to its omnibus account, such as London Broker, through a specific, numbered account (the "Clearing Account"). Neither Feldstein nor Mara Capital had an agreement with the Intermediary Bank to use the Clearing Account, but rather were permitted access to it for clearing and settlement purposes under their agreement with London Broker. The trading arrangement was thus as follows:

- Trades that Feldstein and Mara Capital ordered through the executing broker-dealers could be settled only if Feldstein and Mara Capital directed London Broker to do so.

- Once London Broker received a settlement instruction, it would notify Intermediary Bank to instruct Clearing Bank to deliver payment, in the event of a purchase, or securities, in the event of a sale, to the executing brokers, using cash or securities held in the Clearing Account.

- Clearing Bank would then deliver payment or securities to the executing brokers in exchange for the delivery of stock or payment.

21.     As Feldstein and Vita Health knew, or were reckless in not knowing, Vita Health, unlike Mara Capital, had no account with London Broker, no access to the Clearing Account, and thus no ability to settle trades through the Clearing Account.

**Defendants Defraud Broker-Dealer A**

22.     Feldstein opened an account at Broker-Dealer A for his alter ego corporation, Vita

Health, on March 24, 2008. Feldstein specifically requested and obtained a "DVP" account. In

opening this account, Feldstein and Vita Health provided settlement instructions to Broker-

Dealer A in which they knowingly, intentionally, or recklessly misrepresented that Vita Health

was authorized to settle trades with Broker-Dealer A through the Clearing Account. This was a

material misrepresentation. Vita Health never had an account with London Broker through

which it had access to the Clearing Account, and thus was not authorized to use the Clearing

Account to settle trades.

23.     Feldstein and Vita Health also intentionally, knowingly, or recklessly,

misrepresented or otherwise led Broker-Dealer A to believe that he and Vita Health had cash

sufficient in Vita Health's purported account with London Broker to pay for securities that he

and Vita Health purchased when they ordered the trades, and would make cash available to

Broker-Dealer A to settle such trades. In doing so, they also intentionally, knowingly, or

recklessly, failed to disclose to Broker-Dealer A that they did not have sufficient cash to pay for

the securities they purchased when they ordered the trades, and could not and would not make

funds available to settle trades they ordered.

24.     These false statements and omissions were material to Broker-Dealer A when it

opened the Vita Health DVP account because that account would permit trading in securities,

while the assets used to settle those trades were purportedly in a separate account that was not

visible to or under the control of Broker-Dealer A, and Broker-Dealer A would have to bear the

loss on any unprofitable trades that Defendants Feldstein and Vita Health were unable and/or

unwilling to settle.

25.    Feldstein and Vita Health made their first transaction in the Broker-Dealer A account on September 5, 2008. Feldstein placed an order for Vita Health with the registered representative responsible for Vita Health's account, "Representative A", for 56,550 shares of Lehman ("LEH") stock, which was executed at $16.3903 per share. On September 8, 2008, while the price of LEH stock was in a precipitous decline, Representative A emailed the trade confirmation to Feldstein, advising that the cost of that trade was $928,568. That same day, Feldstein telephoned Representative A and asked for the confirmation number of the trade, ostensibly to give instructions to settle the trade through an account with London Broker with access to the Clearing Account. On September 9, before the settlement date for this LEH transaction, Feldstein placed an order with Representative A for an additional 50,000 LEH shares, which was executed at $8.0313 per share. Shortly afterwards, Representative A sent that trade confirmation to Feldstein, advising that the cost of the trade was $403,065. The price of LEH stock continued to decline after September 9, 2013.

26.    As Defendants knew when they placed these trades and at all times subsequent, or were reckless in not knowing, they did not have sufficient funds to pay for either or both of these trades, nor did they intend to settle them where, as here, they were substantially unprofitable. Furthermore, as Defendants also knew, or were reckless in not knowing, neither Feldstein nor Vita Health held an account with London Broker and thus could not and did not provide London Broker with instructions to settle either of these trades. Defendants knowingly or recklessly concealed these material facts from Representative A and Broker-Dealer A. They further misled Broker-Dealer A when Feldstein asked Representative A for trade details on September 8, before he and Vita Health ordered their second trade on September 9, solely to convey the misimpression that they intended to settle that first trade when, in fact they never intended to do

9

so.

27.    When Clearing Bank received the trade information for Vita Health's initial

purchase on September 10 from Broker-Dealer A, it disaffirmed or "DK'd" ("Don't Know") it –

because Defendants never established an account with London Broker in order to provide

settlement instructions via London Broker to Clearing Bank, and never provided settlement

instructions to London Broker.

28.    Representative A immediately tried to reach Feldstein and left him several

telephone messages, but Feldstein did not return Representative A's calls for two days.  When

Representative A did reach Feldstein on September 12, Feldstein feigned surprise that Clearing

Bank had not settled the trades, and said that the information he had previously provided was

correct.

29.    These were knowingly deceptive statements.  Contrary to what Feldstein told

Representative A, he knew that neither he nor Vita Health had provided instructions to settle the

trades.  He also knew that Vita Health could not do so, because Vita Health held no account at

London Broker.  They also knew that Vita Health lacked the funds to pay for the over $1.3

million in securities it had purchased through Broker-Dealer A, given the steep drop in price of

LEH stock, and Vita Health's inability to use off-setting sales proceeds to cover the cost of the

LEH shares.

30.    On September 12, 2008, Broker-Dealer A, in order to avoid further declines in the

price of the LEH shares, exercised its right to liquidate the LEH shares Feldstein and Vita Health

had fraudulently induced Broker-Dealer A to purchase on their behalf.  The sale was executed at

a price of $3.6232 for net proceeds of $386,050 resulting in a loss to Broker-Dealer A of

$942,387.  Defendants then ignored Broker-Dealer A's demand for payment.

**Defendants Defraud Broker-Dealer B**

31.  Approximately two months after the failed Broker-Dealer A trades, Feldstein

opened a DVP account at Broker-Dealer B for his other company, Mara Capital, on December

18, 2008. Among other things, Feldstein and Mara Capital provided Broker-Dealer B written

settlement instructions identifying the Clearing Account as the settling account for securities

trades placed with it.

32.  In opening this account and providing Broker-Dealer B with these settlement

instructions, Feldstein and Mara Capital intentionally, knowingly, or recklessly, misrepresented

or otherwise led Broker-Dealer B to believe that Mara Capital had cash sufficient to pay for

securities purchased with Broker-Dealer B in Mara Capital's account with London Broker, and

that they would make funds available to settle those trades. In doing so, they also intentionally,

knowingly, or recklessly, failed to disclose to Broker-Dealer B that they did not have sufficient

cash in Mara Capital's account with London Broker to pay for the securities they purchased

when they ordered the trades, and could not and would not make funds available to settle trades

they ordered.

33.  These false statements and omissions were material to Broker-Dealer B when it

opened Mara Capital's DVP account because that account would permit trading in securities

while the purported assets used to settle those trades were purportedly in the separate London

Broker account, which was not visible to or under the control of Broker-Dealer B. Broker-

Dealer B would have to bear the loss on any unprofitable trades that Defendants Feldstein and

Mara Capital were unable and/or unwilling to settle.

34.  To further mislead Broker-Dealer B into believing that Defendants were

financially capable and willing to settle the trades they would order through it, Defendants also

knowingly, intentionally, or recklessly misrepresented on account opening forms to Broker-Dealer B that Mara Capital had assets of $500 million or more. This was a material misrepresentation.

35.    On February 10, 2009, in three separate telephone calls with the registered representative assigned to the Mara Capital account ("Representative B") at Broker-Dealer B, Feldstein placed three separate orders to purchase 100,000 shares of the ETF security Direxion Financial Bull 3X shares (trading symbol "FAS"). The orders were executed as follows: 200,000 shares were purchased in the morning, at $10.67 and $10.77 per share, respectively, for each lot of 100,000 shares, and another 100,000 shares were purchased in the afternoon, after the price declined substantially, at $8.28 per share.

36.    Broker-Dealer B provided Feldstein with a preliminary confirmation of the first two trades by 1:00 p.m., before Feldstein placed his third order for 100,000 shares of FAS. The confirmation reported a total purchase price of $2,149,970. Broker-Dealer B provided Feldstein and Mara Capital with a written confirmation of the third trade, for an additional purchase price of $831,410, before the end of the day. Feldstein and Mara Capital did not object to or otherwise dispute these confirmations, either that day, or at any time before the settlement date of February 13, 2009. As Defendants knew, neither Feldstein nor Mara Capital, contrary to their implicit and explicit representations to Broker-Dealer B, had sufficient cash to pay for these shares in Mara Capital's account with London Broker, nor did Defendants have the intention of paying for them when they placed those trades.

37.    On February 13, 2009, Broker-Dealer B attempted to make an electronic delivery of the 300,000 shares of FAS to Clearing Bank. Clearing Bank initially advised that it had received instructions to settle only 80,000 shares, from the first order Feldstein had placed,

although later on February 13, 2009, Feldstein authorized the settlement of the third purchase for 100,000 shares at the price of $8.28 per share – leaving 120,000 shares that were purchased at the substantially higher prices unsettled. Feldstein simply "DK'ed" those 120,000 shares he had purchased, knowingly and falsely claiming he did not order them. In fact, these trades did not settle because Feldstein intentionally refused to instruct London Broker to settle them, because the price of FAS had declined from those purchase prices after the trade date, and he had no intention of losing substantial sums on his trades, nor did he have the cash to pay for the shares – facts that he knowingly concealed from Broker-Dealer B when he opened the account, when he placed the trades, and at all times thereafter.

38.     Feldstein was successful in making profitable, off-setting sales of FAS for only 180,000 of the 300,000 shares he had committed to buy, and he had no intention of paying for any more of the shares he instructed Broker-Dealer B to buy. Feldstein disregarded the repeated requests from Representative B and others at Broker-Dealer B to settle the remaining 120,000 shares Defendants purchased at higher, unprofitable prices. At first, Feldstein proffered family medical problems to avoid speaking with anyone at Broker-Dealer B. Then, he simply ignored their emails, telephone calls and correspondence altogether.

39.     Subsequently, on February 18 and 20, Broker-Dealer B liquidated the 120,000 shares of FAS for which Mara Capital and Feldstein continued to refuse to pay, incurring a total loss of $624,016.

40.     Feldstein and Mara Capital, even while intentionally refusing to settle their unprofitable trades, repeatedly and consistently settled profitable trades placed in their DVP account with Broker-Dealer B. They did so when they were able to offset purchases at Broker-Dealer B with sales at higher prices with other broker-dealers, and thus avoided having to use

13

their own money. Between February 10 and 20, when Feldstein and Mara Capital left Broker-Dealer B with $624,016 in losses on Defendants' unsuccessful stock market gambles, Feldstein and Mara Capital placed and settled three profitable trades through Broker-Dealer B that yielded $67,690 in profits to them. Moreover, on February 17, 2009, the day before Broker-Dealer B was forced to liquidate the 120,000 FAS shares at a loss for non-payment, Feldstein, directed London Broker to transfer $100,000 from Mara Capital's London Broker account to Mara Capital's bank account, which was effected on February 20, 2009. This amount included the $67,690 in profits previously earned on trades through Broker-Dealer B. Thus, while Feldstein and Mara Capital left Broker-Dealer B with $624,016 in losses, they first withdrew the profits earned at Broker-Dealer B's expense in their free-riding scheme.

### Defendants Defraud Broker-Dealer C.

41.     A few months after their fraudulent trading with Broker-Dealer A, and shortly after they opened an account at Broker-Dealer B, Feldstein and Mara Capital also opened another DVP account for Mara Capital with Broker-Dealer C, on January 6, 2009. The DVP account allowed Mara Capital to purchase securities and have the securities electronically delivered to a financial institution designated by Mara Capital in return for immediate electronic payment to Broker-Dealer C.

42.     In opening the account, Defendants Feldstein and Mara Capital, among other things, provided Broker-Dealer C with written settlement instructions identifying the Clearing Account as the settling account for trades placed in the Broker-Dealer C DVP account. In doing so, Feldstein and Mara Capital intentionally, knowingly, or recklessly, represented or otherwise led Broker-Dealer C to believe that they had cash sufficient to pay for securities that they purchased in Mara Capital's account with London Broker when they ordered the trades, and that

14

they would make those funds available to settle trades they ordered. In doing so, they also intentionally, knowingly, or recklessly failed to disclose to Broker-Dealer C that they did not have sufficient cash in Mara Capital's account with London Broker to pay for the securities they purchased when they ordered the trades, and could not and would not make funds available to settle such trades.

43.     These false statements and omissions were material to Broker-Dealer C when it opened Defendants Feldstein and Mara Capital's DVP account, because that account would permit trading in securities while the assets used to settle those trades were purportedly in the London Broker account, which was not visible to or under the control of Broker-Dealer C. Broker-Dealer C would have to bear the loss on any unprofitable trades that Defendants Feldstein and Mara Capital were unable and/or unwilling to settle.

44.     Less than a week after opening the DVP account, on January 12, Feldstein placed a market order by telephone to buy 50,000 shares of Dryships, Inc. ("DRYS") with the registered representative assigned to his account ("Representative C"). Representative C called Feldstein that day to confirm the execution of the trade, at $15.20 per share, for a total cost of $760,750. Representative C's sales assistant then emailed Feldstein a written confirmation of the trade early the next morning.

45.     On January 15, 2009, the settlement date, and then again on January 16, and once more on February 9, Clearing Bank rejected delivery of the 50,000 Dryships shares because Mara Capital had not provided settlement instructions. When Representative C and others at Broker-Dealer C confronted Feldstein with this "DK'd" trade, he repeatedly proffered false excuses, such as "accounting" and "reconciliation" problems with the DVP account, and assured individuals at Broker-Dealer C that he would take care of it.

46.     Feldstein's excuses were knowingly, intentionally, or recklessly false.  There were no "accounting" or "reconciliation" problems that prevented the settlement of this trade. The trade did not settle because Feldstein intentionally refused to instruct London Broker to settle it, because the price of Dryships stock had declined after the trade date, and he had no intention of losing substantial sums on his trade, nor did he have the cash to pay for the shares – facts that he knowingly concealed from Broker-Dealer C when he opened the account, when he placed the trade, and at all times thereafter.

47.     Faced with Feldstein and Mara Capital's refusal to settle their purchase transaction, Broker-Dealer C finally liquidated the 50,000 Dryships shares, on February 9, at the prevailing market price, which resulted in a deficit balance to Mara Capital's account of $442,622.

48.     While walking away from their unprofitable trades, Defendants settled trades that were profitable, in circumstances where Defendants were successful in executing offsetting sales at other broker-dealers at prices higher than those at which they had purchased, and thus required no funds from them.  Feldstein and Mara Capital pocketed $166,129 in profits from such trades placed at Broker-Dealer C from January 9 to February 5.  Indeed, Feldstein and Mara Capital siphoned a total of $125,000 from Mara Capital's London Broker account to its corporate bank account on January 30, 2009 and February 3, 2009, even while "DK'ing" the unprofitable trades he stuck Broker-Dealer C with.

### Defendants' Fraudulent Offerings of Securities to Investors

#### Investor A

49.     Investor A is the owner of a dry cleaning business located in New York, New York.  Feldstein became acquainted with Investor A during the approximately 30 years that he was a regular customer of Investor A's.

50.     On or around September 10, 2009, Feldstein began soliciting Investor A for two distinct investments. First, Feldstein told Investor A about "Company X," a penny stock issuer that Feldstein described as the next AT&T/Verizon of the rural Midwest. Feldstein told Investor A that Company X's business plan was to bring telecommunications services to rural communities. Company X was trading at a price of $1.71 – $2.35 during September 2009. He assured Investor A that Investor A would not lose a penny and encouraged Investor A to give him $100,000 for Company X stock. Feldstein knowingly or recklessly omitted the material fact that the shares he told Investor A he could procure for him were not freely tradable, but rather were restricted.

51.     Feldstein also told Investor A about a purportedly new clothing company that Feldstein ran with the former CEO of a major American clothing label. Feldstein claimed that the company was about to conduct an initial public offering at an expected price of $3.00 – $5.00 per share. Feldstein told Investor A that he was offering the shares to him at only $1.00 per share, and recommended that Investor A invest $100,000 in that company.

52.     In the days following, Feldstein continued to press Investor A to invest in Company X and the purported fashion company IPO. Upon his insistent urging, Investor A made checks out to Feldstein's entity, Trademore, on September 14, 2009 for $200,000 – $100,000 for Company X stock and $100,000 for the IPO shares. Investor A received 66,667 shares of Company X stock. The stock, however, was restricted, precluding Investor A from trading it on the market. This was a material fact that Feldstein intentionally or recklessly omitted when inducing Investor A to invest his money in exchange for the Company X stock.

53.     Feldstein's representation that he would provide Investor A with IPO shares in the purported fashion company in exchange for his $100,000, moreover, was false, and Feldstein

17

knew it was false, or acted recklessly, when he made it. Feldstein, to this date, has never provided Investor A with the purported IPO shares, and instead spent that $100,000 for his own purposes and uses, which was his plan when he induced Investor A to give him money.

54.    In early February 2010, Feldstein arrived at Investor A's dry cleaner, and told Investor A that the Company X stock was trading as high as $2.90 per share, and that he had found an investor willing to sell Investor A even more shares, for a below-market price, for a total cost of $112,500. Investor A gave Feldstein two checks totaling $112,500, which Feldstein promptly cashed. Feldstein never delivered any additional shares of Company X to Investor A, and he never intended to. Feldstein's material representations to Investor A that he would deliver the shares to him were knowingly or recklessly false. Feldstein intended to, and did, use Investor A's $112,500, by contrast, for his own personal use.

55.    Investor A subsequently insisted that Feldstein return his money, but Feldstein repeatedly failed and refused to do so.

**Investors B and C**

56.    Investor B has known Feldstein since the 1980s because Investor B's family runs a car leasing and servicing business of which Feldstein has been a longtime customer. Investor B was an employee of the business, which leased and serviced Feldstein's Bentley automobile.

57.    In the summer of 2009, Feldstein began touting Company X stock to Investor B and his wife, Investor C. Feldstein told them that Company X was a lucrative investment opportunity and that Company X's CEO was a good friend of his. Feldstein also provided Investors B and C with a Company X prospectus, and represented that he was a dealer or representative of Company X. In that purported guise, Feldstein offered Investors B and C 100,000 shares of Company X stock for $150,000, or $1.50 per share.

58.     Investors B and C told Feldstein that they could afford only $117,500 to invest in Company X, which Feldstein accepted, at the same price of $1.50 per share. Feldstein urged Investors B and C to deal directly with him, rather than with Company X. Between August 17, 2009 and October 23, 2009, Investors B and C gave $117,500 in cash and checks directly to Feldstein, which was deposited in Feldstein's personal bank account, and that of his company, Trademore. Investors B and C also filled out and signed a subscription agreement with Company X, dated October 12, 2009, for 78,333 shares, purportedly in exchange for their total payments to Feldstein. As Feldstein had urged Investors B and C to deal with him, rather than Company X, Investors B and C faxed that subscription agreement to Feldstein, not Company X, on or about October 12, 2009.

59.     Feldstein's representations to Investors B and C were materially false, and knowingly or recklessly so. Feldstein never intended to use the $117,500 he induced them to give him to obtain Company X stock, and he never did so. Rather, his dealings with Investors B and C were part of his fraudulent scheme to obtain their money, and divert it for his own uses and purposes, which Feldstein carried out after those deposits were made.

60.     After they gave their $117,500, Investors B and C repeatedly insisted to Feldstein that he deliver the stock he had led them to believe they had paid for. He ignored them. He subsequently ignored their later demands for the return of their money.

**Investor D**

61.     Investor D, the owner of a gelato business on Long Island, met Feldstein in early October 2011. Over the course of several weeks in October, Feldstein met with Investor D at Investor D's offices for the purpose of inducing Investor D to give him cash as an investment in the hedge fund that Feldstein purportedly owned and operated with another partner.

62.     During these meetings, Feldstein represented that the hedge fund he owned and

operated with another partner had more than $20 million in assets, and assured Investor D that it had been earning large returns for investors, had access to new issues, and was a low risk investment. Feldstein's representations to Investor D were knowingly or recklessly, and materially, false. Feldstein was not the owner or operator of a hedge fund with $20 million in assets, and had no intention of providing Investor D with any share of a hedge fund with money he induced Investor D to give him. Feldstein made these misrepresentations solely to obtain Investor D's cash and convert it for his own use, and provided Investor D with nothing of value in return.

63.     During his meetings with Investor D, Feldstein also purported to be interested in investing in Investor D's gelato business, and otherwise helping it expand and become more successful. Feldstein pressured Investor D to invest quickly, so as not to miss the investment opportunities Feldstein's hedge fund could offer him.

64.     On October 26, 2011, Feldstein came to Investor D's office, and again pressured Investor D to invest in his hedge fund. When Investor D asked for paperwork to document an investment, Feldstein grew impatient, and threatened to withhold any future assistance with Investor D's business. Investor D then agreed to provide Feldstein with cash, and drove with Feldstein to Investor D's bank, where Investor D arranged to deposit $150,000 with Feldstein, by writing a check to MJJS Corp., a company that Feldstein told Investor D he owned, and which would invest in the hedge fund on Investor D's behalf. In fact, MJJS had been dissolved on April 27, 2011.

65.     Feldstein immediately deposited Investor D's $150,000 check into an MJJS account at the same bank. Several days later, Investor D requested that Feldstein return his money, which Feldstein did not do. Feldstein also did not furnish Investor D with a

corresponding interest in a hedge fund investment.

66.    In fact, Feldstein had converted Investor D's money for his own purposes and except for a wire of $27,000 to Investor D's business on October 31, 2011, has failed and refused to return Investor D's money to him.  When Investor D continued to press Feldstein for the return of his money, Feldstein denied any involvement with MJJS.  Feldstein also told Investor D, in direct contradiction to the representations he made to Investor D before Investor D invested, that he had no involvement with a hedge fund, or the money that Investor D deposited with MJJS.  Feldstein also told Investor D that he, Feldstein, was judgment-proof.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a)(1)-(3) of the Securities Act**
(Against Feldstein)

67.    The Commission realleges and incorporates paragraphs 1 through 66 by reference as if fully set forth herein.

68.    By engaging in the acts and conduct described in this Complaint,  Feldstein by use of any means or instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, in the offer or sale of securities has:

a.  Employed devices, schemes, and artifices to defraud;

b.  Obtained money or property by means of untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c.  Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

69.    Feldstein engaged in the above conduct knowingly or recklessly.

70.     By virtue of the foregoing, Feldstein, directly or indirectly, has violated, and unless restrained and enjoined, will continue to violate Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b))
(Against Feldstein, Vita Health, and Mara Capital)

71.     The Commission realleges and incorporates paragraphs 1 through 66 by reference as if fully set forth herein.

72.     By virtue of the foregoing, Feldstein, Vita Health, and Mara Capital, directly or indirectly, singly or in concert, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities with scienter:

      d.  Employed devices, schemes and artifices to defraud;

      e.  Made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and

      f.  Engaged in acts, practices and courses of business that would operate as a fraud or deceit upon any person.

73.     By reason of the foregoing Feldstein, Vita Health, and Mara Capital, directly or indirectly, singly or in concert, violated, and unless enjoined, will violate again, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment)
### (Against Relief Defendant Trademore)

74.     The Commission realleges and incorporates paragraphs 1 through 66 by reference as if fully set forth herein.

75.     Relief Defendant Trademore obtained proceeds of the fraudulent offerings of securities alleged above under circumstances in which it is not just, equitable, or conscionable for Trademore to retain these ill-gotten gains.  Trademore gave no consideration for its receipt of these ill-gotten gains and has no legitimate claim to these funds.  Trademore has therefore been unjustly enriched.

76.     By reason of the foregoing, Relief Defendant Trademore should disgorge its ill-gotten gains, plus prejudgment interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court enter final judgments against the Defendants and Relief Defendant granting the following relief:

### I.

Finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged herein.

### II.

Permanently, restraining and enjoining Defendant Feldstein, his agents, servants, employees and attorneys and all persons in active concert or participation with him, who receive actual notice of the injunction by personal service or otherwise, and each of them, from committing future violations of Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

**III.**

Permanently, restraining and enjoining Defendants Feldstein, Mara Capital, and Vita

Health, their agents, servants, employees and attorneys and all persons in active concert or

participation with them, who receive actual notice of the injunction by personal service or

otherwise, and each of them, from committing future violations of Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**IV.**

Directing Defendants Feldstein, Vita Health, and Mara Capital, and Relief Defendant

Trademore to disgorge, with prejudgment interest thereon, all ill-gotten gains, received directly

or indirectly as a result of the misconduct alleged herein, jointly and severally, and such other

and further amount as the Court may find appropriate.

**V.**

Directing Defendant Feldstein to pay civil money penalties pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)].

**VI.**

Directing Defendants Feldstein, Vita Health, and Mara Capital to pay civil money

penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Enjoining and restraining Feldstein from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## VIII.

Granting such other and further relief as this Court deems just and proper.

Dated:  September 3, 2013
        New York, New York


                              SECURITIES AND EXCHANGE COMMISSION

                              By: _____
                                      Andrew M. Calamari
                                      Regional Director

                              Attorney for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              3 World Financial Center, Suite 400
                              New York, New York 10281-1022
                              (212) 336-0148 (Primoff)
                              Email:  primoffr@SEC.gov

Of Counsel:

Celeste A. Chase
Richard G. Primoff
Katherine S. Bromberg